City of Johnstown,                          :
                          Petitioner        :
                                            :
            v.                              :      No. 1156 C.D. 2019
                                            :      Submitted: January 10, 2020
Workers' Compensation Appeal                :
Board (Sevanick),                           :
                          Respondent        :


BEFORE:    HONORABLE MARY HANNAH LEAVITT, President Judge
           HONORABLE MICHAEL WOJCIK, Judge
           HONORABLE J. ANDREW CROMPTON, Judge

OPINION NOT REPORTED

MEMORANDUM OPINION
BY JUDGE CROMPTON                                   FILED:  May 6, 2020


          This appeal involves a firefighter cancer claim under Section 108(r) of
the Workers' Compensation Act (Act),[1] which added cancer to the list of
occupational diseases for firefighters in July 2011, as a result of the passage of what
is commonly known as "Act 46."[2]  Specifically, the City of Johnstown (Employer)
petitions for review of an order of the Workers' Compensation Appeal Board
(Board) affirming the decision and order of a Workers' Compensation Judge (WCJ)
granting the claim petition (Petition) filed by retired firefighter Michael Sevanick

---

[1] Act of June 2, 1915, P.L. 736, *as amended*, 77 P.S. §§1-1041.4; 2501-2710.  Section
108(r) recognizes "[c]ancer suffered by a firefighter which is caused by exposure to a known
carcinogen which is recognized as a Group 1 carcinogen by the International Agency for Research
on Cancer," as a compensable occupational disease under the Act.  77 P.S. §27.1(r).

[2] Act of July 7, 2011, P.L. 251.

(Claimant). Employer contends that the Board erred because (1) Claimant failed to meet his burden of proof that he was exposed to an International Agency for Research on Cancer (IARC) Group 1 carcinogen, within 600 weeks of filing his claim, that could have caused his kidney cancer, and (2) the WCJ's calculation of Claimant's benefits was incorrect. Upon review, we affirm.

## I. Background

On January 8, 2016, Claimant filed his Petition seeking benefits for kidney cancer alleged to have been caused by his exposure to IARC Group 1 carcinogens during his employment as a firefighter.

Claimant testified that he joined Employer's fire department on June 1, 1977, at which time he underwent a physical examination. He was not treated for any form of cancer during his 20-plus-year firefighting career with Employer. He was a firefighter until 1997 and held the rank of captain from 1997 until 2005. He then served as acting assistant chief, and then assistant chief, until his retirement. He worked in five different fire stations throughout his career and was located at headquarters for approximately two years immediately prior to his retirement on September 10, 2006.

Claimant testified that he smelled diesel fuel during every shift he worked in a firehouse. As to firefighting, Claimant estimated that he fought at least 1,200 to 1,400 fires which involved smoke in varying severity. He was engaged in both interior and exterior firefighting, although the vast majority of his experience was in interior firefighting. While he used various self-contained breathing

2

apparatuses during his career, he did not wear such an apparatus when fighting exterior fires. He testified that during his first 10 years of using a self-contained breathing apparatus, such usage was "on demand," meaning the mask was not pressurized, and a gap in the mask allowed smoke to enter. Reproduced Record (R.R.) at 27a-28a. Later in his career, the apparatus was upgraded to positive pressure. He wore the mask during the initial phase of interior firefighting but rarely during overhaul, which is the phase in which firefighters ensure all the hotspots are addressed.

Claimant testified that he would smell smoke on himself, even after taking a shower, and that he would blow black soot out of his nose for several days after fighting a fire. R.R. at 34a. When he was an assistant chief, he was frequently exposed to some level of smoke while investigating a fire's origin. He responded to fires until the end of his career, and he was exposed to smoke and diesel exhaust through the summer of 2006. R.R. at 37a.

Claimant was a smoker between 1964 and 1994, when he quit. He smoked no more than one pack of cigarettes per day, although at times, he would reduce his smoking to a half pack per day or attempt to quit altogether. R.R. at 40a. He noted smoking was permitted in the fire station until the late 1990s. He further testified that his parents had no history of cancer but that his oldest brother was diagnosed with prostate cancer at age 68 or 69. R.R. at 39a-40a.

Claimant was diagnosed with kidney cancer in 2015 and underwent surgery for it. He received no radiation, chemotherapy, or medication. However,

3

he received a CT scan six months after surgery and was told to get annual, follow-up CT scans for the next five years. R.R. at 38a. He was never informed by a physician that there was a relationship between his fire service and his cancer until he reviewed a January 7, 2016 report from Tee L. Guidotti, M.D., who is board certified in internal, pulmonary, and occupational medicine.

In support of his Petition, Claimant submitted Dr. Guidotti's report and deposition testimony. Dr. Guidotti confirmed that he reviewed Claimant's medical records. He opined that, within a reasonable degree of medical certainty, Claimant's kidney cancer is clearly a type of cancer that can be caused by IARC Group 1 carcinogens and that Claimant's exposure to many IARC Group 1 carcinogens during his career as a firefighter was a substantial contributing factor in the development of his cancer. R.R. at 71a; R.R. at 96a. In his report, Dr. Guidotti wrote: "My understanding is that the issue on which my opinion is requested is whether [Claimant's] exposure to carcinogens as a firefighter was a substantial contributing factor in his risk for renal cell cancer. My answer is clearly yes." R.R. at 71a. Further, Dr. Guidotti opined, in pertinent part:

> 2. Was [Claimant's] exposure to IARC Group 1 carcinogens a substantial contributing factor in the development of his cancer?
>
> Yes, within reasonable medical certainty. That he was exposed to many IARC Group 1 carcinogens during his career as a firefighter is without question. Firefighting is associated with an elevated risk of kidney cancer, of a magnitude above other risk factors. The cholorinated aliphatic hydrocarbons, in particular, are potent kidney carcinogens. This certainly qualifies as "substantial." Exposure to these renal carcinogens increased his risk of kidney cancer from all causes and were sufficient cause in themselves.

4

> 3. Is renal carcinoma a type of cancer that can be caused by IARC Group 1 carcinogens found in the work environment?
>
> Yes, clearly.

*Id*. Dr. Guidotti added that chlorinated aliphatic hydrocarbons, found in trichloroethylene (a Group 1 carcinogen) and tetrachloroethylene (a Group 2 carcinogen), are potent kidney carcinogens present in the smoke from burning materials.

Dr. Guidotti acknowledged that it is impossible to pinpoint a fire call or a last date upon which Claimant was exposed to an amount of any carcinogen that contributed to his cancer. R.R. at 120a. However, he added that thinking in terms of a particular event is misleading because a carcinogen interacts with a number of cells the same way at the same time, but the human immune system keeps some affected cells from becoming cancerous. He added that the conclusion of a demonstrable risk of cancer among firefighters is not dependent on a particular carcinogen, such as trichloroethylene, but trichloroethylene stands out because it is present at fires and its effects are known.

Dr. Guidotti acknowledged that Claimant was a smoker, but he did not consider Claimant a heavy smoker. He also noted Claimant quit smoking in 1994. In addition, Dr. Guidotti testified that the association between cigarette smoking and kidney cancer exists, but is not strong, and that it is considerably less than the association emerging between firefighting and kidney cancer in relevant studies. R.R. at 37a-38a; R.R. at 701a (*See* WCJ Decision and Order, 12/27/17, Finding of Fact (F.F.) No. 6).

In response to Claimant's evidence, Employer did not present a medical witness of its own; rather it submitted the IARC Monograph 98 with respect to firefighting and the IARC Monograph 106[3] with respect to trichloroethylene.[4]

The WCJ credited Claimant's testimony based on his demeanor during live testimony and because his testimony was internally consistent and unrebutted. F.F. No. 12. The WCJ also found Dr. Guidotti's testimony competent and credible, in significant part because it was internally consistent and sufficiently supported by the relevant literature. F.F. No. 13. Based on these credibility determinations, the WCJ found Claimant: underwent pre-diagnosis physical examinations which did not show cancer prior to March 2015; had more than four years of continuous fire service with direct exposure to IARC Group 1 carcinogens and that his exposure to IARC Group 1 carcinogens was a substantial contributing factor in the development of his kidney cancer; provided timely and sufficient notice of his injury via the claim Petition he filed in January 2016; was totally disabled due to his work-related kidney

---

[3] According to the National Center for Biotechnology Information of the United States National Library of Medicine, "[t]he IARC Monographs identify environmental factors that can increase the risk of human cancer. These include chemicals, complex mixtures, occupational exposures, physical agents, biological agents, and lifestyle factors. National health agencies can use this information as scientific support for their actions to prevent exposure to potential carcinogens." *See* https://www.ncbi.nlm.nih.gov/books/NBK294452/ (last visited on May 5, 2020).

[4] Employer also presented two articles: Grace LeMasters, Ph.D., *Cancer Risk Among Firefighters: A Review and Meta-analysis of 32 studies* (November 2006), and Eero Pukkala, *Cancer Incidence Among Firefighters: 45 Years of Follow-up in Five Nordic Countries* (February 2014).

cancer from March 27, 2015, through and including May 21, 2015; and returned to work in a part-time position with the Thomas Honda car dealership on May 22, 2015. F.F. No. 14. Employer appealed to the Board.

On appeal to the Board, Employer argued that the 300-week provision of Section 301(c)(2) of the Act, 77 P.S. §411.2,[5] extinguished Claimant's claim in the present matter. In affirming the WCJ, the Board determined that the 300-week provision did not govern. It observed that, although Claimant's last date of work, exposure, and retirement occurred prior to July 2011 (the effective date of Act 46), the credible evidence established Claimant was not diagnosed with, treated for, or disabled by his cancer until 2015. The Board opined that where, as here, Claimant's disease occurred *after* the effective date of Act 46, he had 600 weeks to bring his claim as provided in Section 301(f) of the Act, 77 P.S. §414. *See* Bd. Op., 7/30/19, at 15-16.

The Board also rejected Employer's assertion that the Petition should have been dismissed because Claimant failed to prove he made his claim within 600 weeks of the last date of exposure to Group 1 carcinogen trichloroethylene and that Dr. Guidotti did not establish Claimant's occupational exposures caused his cancer. As to this latter point, Employer contended that Dr. Guidotti's opinion was insufficient because he opined that Claimant's exposures were only a substantial contributing factor to Claimant's cancer, rather than the cause of the cancer at a specific point in time. *See* Bd. Op. at 16-20.

---

[5] Section 301 of the Act, 77 P.S. §411.2, was added to the Act by Section 9 of the Act of December 5, 1974, P.L. 782.

7

In addition, Employer challenged the WCJ's calculation of indemnity benefits based on Claimant's average weekly wage (AWW) as of September 10, 2006, rather than his AWW as of his date of disability in 2015, when he was working as a part-time driver for Thomas Honda. The Board rejected Employer's contention, noting that the rate of compensation in an occupational disease case is based on the date of injury, which must be the date of last exposure. In the present case, Claimant's date of last exposure occurred in 2006. *See* Bd. Op. at 20. Employer petitions this Court for review of the Board's order.[6]

## II.    Discussion

On appeal, Employer presents two primary issues for our review. First, Employer contends that Claimant failed to prove he was exposed to an IARC Group 1 carcinogen that could have possibly caused his kidney cancer within 600 weeks of the date he made his claim. Second, Employer asserts that, to the extent Claimant is entitled to disability benefits, the Board erred in affirming the WCJ's calculation of same.

## A. Applicable Law

Our Supreme Court has held that, under Act 46, a claimant must initially establish he has an occupational disease as defined by Section 108(r) and must produce evidence that *it is possible* that the carcinogen in question causes the type of cancer he has. *City of Phila. Fire Dep't v. Workers' Comp. Appeal Bd. (Sladek)*, 195 A.3d 197 (Pa. 2018). However, the Court noted that Section 108(r)

---

[6] Our review is limited to determining whether the WCJ's findings of fact were supported by substantial evidence, whether an error of law was committed or whether constitutional rights were violated. *Phoenixville Hosp. v. Workers' Comp. Appeal Bd. (Shoap)*, 81 A.3d 830 (Pa. 2013).

8

*does not require* the claimant to prove that the identified Group 1 carcinogen *actually*

*caused* the cancer.  The *Sladek* court stated:

> Section 108(r) embodies a legislative acknowledgement that firefighting is a dangerous occupation that routinely exposes firefighters to Group 1 carcinogens that are known to cause various types of cancers. The "general causation" requirement under Section 108(r) constitutes a recognition that different types of cancers have different etiologies and it weeds out claims for compensation for cancers with no known link to Group 1 carcinogens.  <u>The burden imposed by Section 108(r) is not a heavy burden.</u>   In this regard, epidemiological evidence is clearly relevant and useful in demonstrating general causation ….While epidemiological evidence supports the burden of establishing general causation, where the claimant has established an entitlement to the evidentiary presumption of compensability under Section 301(f), such epidemiological evidence <u>is not sufficient</u> to rebut the presumption. As the language of Section 301(f) plainly provides, the evidence required to rebut this presumption must show that "the firefighter's cancer was not caused by the occupation of firefighting.

*Id.* at 208-209 (emphasis added).

Section 301(c) of the Act pertinently provides:

(1) The terms "injury" and "personal injury," as used in this act, shall be construed to mean an injury to an employe, regardless of his previous physical condition, <u>except as provided under subsection (f)</u>, arising in the course of his employment and related thereto, and such disease or infection as naturally results from the injury ….

(2) The terms "injury," "personal injury," and "injury arising in the course of his employment," as used in this act, shall include…occupational disease as defined in section 108 of this act.  Provided, That whenever occupational disease is the basis for compensation, for disability or death under this act, it shall

apply only to disability or death resulting from such disease and occurring within **three hundred weeks** after the last date of employment in an occupation or industry to which he was exposed to hazards of such disease.... The employer liable for compensation provided by…section 108, subsections (k), (l), (m), (o), (p), (q) or (r), shall be the employer in whose employment the employe was last exposed for a period of not less than one year to the hazard of the occupational disease claimed….

77 P.S. §411 (emphasis added).

As it is relevant here, we note again that Section 108(r) includes: "[c]ancer suffered by a firefighter which is caused by exposure to a known carcinogen which is recognized as a Group 1 carcinogen by the [IARC]." 77 P.S. §27.1(r).

Section 301(f) of the Act applies specifically to claims for compensation for cancer suffered by a firefighter and caused by direct exposure to certain carcinogens while performing firefighter duties. It provides:

Compensation pursuant to cancer suffered by a firefighter shall only be to those firefighters who have served four or more years in continuous firefighting duties, who can establish direct exposure to a carcinogen referred to in section 108(r) relating to cancer by a firefighter and have successfully passed a physical examination prior to asserting a claim under this subsection or prior to engaging in firefighting duties and the examination failed to reveal any evidence of the condition of cancer. The presumption of this subsection may be rebutted by substantial competent evidence that shows that the firefighter's cancer was not caused by the occupation of firefighting.… Notwithstanding the limitation under subsection (c)(2) with respect to disability or death resulting from an occupational disease having to occur within three hundred weeks after the last date of employment in an occupation or industry to which a claimant was exposed to the hazards of disease, claims filed pursuant to cancer suffered by the firefighter under section 108(r) may be made within **six**

10

> **hundred weeks** after the last date of employment in an occupation or industry to which a claimant was exposed to the hazards of the disease. The presumption provided for under this subsection shall only apply to claims made within the first three hundred weeks.

77 P.S. §414 (emphasis added).

This Court has held that a claimant needs to satisfy the 300-week requirement of Section 301(c)(2) of the Act for occupational diseases occurring *before* the effective date of Act 46, whereas Section 301(f) of the Act applies where a claimant's disease occurs *after* the effective date of Act 46 (July 7, 2011). *Caffey v. Workers' Comp. Appeal Bd. (City of Phila.)*, 185 A.3d 437 (Pa. Cmwlth. 2018); *City of Warren v. Workers' Comp. Appeal Bd. (Haines)*, 156 A.3d 371 (Pa. Cmwlth.), *appeal denied*, 170 A.3d 1039 (Pa. 2017).

Act 46 defined a distinct limitations period in Section 301(f), mandating that an occupational disease claim under Section 108(r) be filed within 600 weeks of the last date of workplace exposure to a Group 1 carcinogen. *Fargo v. Workers' Comp. Appeal Bd. (City of Phila.)*, 148 A.3d 514 (Pa. Cmwlth. 2016). In *Fargo*, we noted the key difference between the limitations periods in Section 301(c)(2) and 301(f) is not the date upon which the periods start, but rather what must take place before the periods end. Under Section 301(c)(2), disability or death from the disease must occur within 300 weeks, whereas under Section 301(f), the claimant must file the claim within 600 weeks of the last date of workplace exposure to a Group 1 carcinogen. *Id.* at 520. Notwithstanding the 300-week limitation of Section 301(c)(2), Section 301(f) provides a two-tiered limitation period for Section 108(r) occupational disease claims. First, to qualify for the presumption, a claimant must

11

file the claim within 300 weeks of the last date of work with exposure to a known Group 1 carcinogen. If a claimant fails to bring a claim within the 300-week period, the claimant loses the statutory presumption addressed in Section 301(e)[7] and 301(f). However, if the claimant does not file the claim until more than 600 weeks after the date of last workplace exposure, the claimant is foreclosed from bringing that claim in its entirety. *Id.*

As to Claimant's AWW, a claimant is entitled to benefits based on his wages at the time of his last exposure. *See Fisk v. Workmen's Comp. Appeal Bd. (Gen. Elec.)*, 633 A.2d 1305 (Pa. Cmwlth. 1993). Relying on the Board's regulations (34 Pa. Code §121.14) in occupational disease cases, we explained the following:

> Although we acknowledge that determining the date of injury can be somewhat problematic in occupational disease cases, we note that the Board's regulations provide guidance in calculating an employee's weekly wage. Pursuant to 34 Pa. Code §121, "[t]he weekly wage [in occupational disease cases] will be determined in accordance with section 309 of the act (77 P.S. §582), and will be subject to the maximum rate in effect at the date of last exposure."
>
> . . . .
>
> We note that if we were to accept…that benefits are to be awarded based on the rate of compensation in effect on the date that employee's disability manifests itself into a loss of earning power, an illogical and unjust result would occur for those employees who are unemployed or retired as of the manifestation

---

[7] Section 301(e) of the Act states: "If it be shown that the employe, at or immediately before the date of disability, was employed in any occupation or industry in which the occupational disease is a hazard, it shall be presumed that the employe's occupational disease arose out of and in the course of his employment, but this presumption shall not be conclusive." 77 P.S. §413 (emphasis added).

> date and thus have no earnings upon which to base an award. We therefore, conclude that for the purpose of calculating benefits in occupational disease cases under the Act, the date of injury must be the date of last exposure.

*Id.* at 1307.


## B. Analysis

### 1. Timeliness of Petition and Claimant's Burden of Proof

Employer first contends that the Board erred in affirming the WCJ where Claimant failed to meet his burden of proving he was exposed to an IARC Group 1 carcinogen that could have possibly caused his kidney cancer within 600 weeks of the date he filed his claim. Employer concedes Claimant developed kidney cancer and that he worked as one of its firefighters for more than four years. However, Employer asserts that Claimant did not prove his kidney cancer was caused by occupational exposure to an IARC Group 1 carcinogen within 600 weeks from the filing of his claim petition, and thus, the Petition was untimely.

Based on Claimant's credited testimony, he was last at a fire scene in the summer of 2006. He did not file his claim until January 8, 2016. This was approximately 490 weeks later (presuming a date of August 1, 2006). Employer maintains that Claimant did not demonstrate he was exposed to a qualifying carcinogen as of that time (*i.e.*, the date upon which he was last at a fire scene in the summer of 2006). Employer asserts that Claimant was required to present evidence he was last exposed to an IARC Group 1 carcinogen that could have possibly caused kidney cancer within 600 weeks of filing his claim. Employer maintains that the WCJ found that "trichloroethylene would not be detected at every fire" and that there was "no way to pinpoint a fire call or last date that Claimant was exposed to an

13

amount of any carcinogen that contributed to his cancer." Petitioner's Brief at 18 (citing R.R. at 703a). Employer asserts that the WCJ's determination is clear reversible error because no date of last exposure was established for any Group 1 carcinogen, and the WCJ merely presumed Claimant's exposure. We disagree.

As the Board noted, and we agree, "Employer's interpretation is not in accord with *Sladek* and imposes an almost impossible burden. Employer does not proffer an explanation as to how a typical firefighter would be able to pinpoint the exact moment of exposure to a particular Group 1 carcinogen." *See* Bd. Op. at 17. And, as the Supreme Court stated in *Sladek*, "the burden imposed by Section 108(r) is not a heavy one." *Sladek*, 195 A.3d 197 at 208. Relying on *Cable v. Workmen's Compensation Appeal Board (Gulf Oil/Chevron USA, Inc.)*, 664 A.2d 1349 (Pa. 1995), Employer further asserts that the 600-week filing limitation at issue in the present matter is measured from the last date of exposure to the hazard alleged to have caused the disease, not from the last date of employment. However, in *Fargo*, we stated that "[t]he 'triggering event' for the purposes of Section 301(f) of the Act is not the date of injury or disability, as in Section 315, but rather the claimant's last day at work with exposure to a known Group 1 carcinogen." *Fargo*, 148 A.3d 514 at 521. In the present matter, Claimant's last workplace exposure would have occurred in approximately August 2006, well within the 600 weeks prior to the filing of his Petition.[8]

---

[8] This was over *100 weeks (i.e., nearly two years)* before the deadline for filing his Petition and at a point in his career when he had already been exposed to a significant amount of Group 1 carcinogens at 1,200 to 1,400 fires.

14

Employer further contends that Claimant's Petition should have been denied because he was not disabled within 300 weeks of his last date of exposure to the hazard, per Section 301(c)(2) of the Act. In this regard, Employer relies on the unreported case of *Szymanski v. Workers' Compensation Appeal Board (City of Philadelphia)* (Pa. Cmwlth., No. 494 C.D. 2016, filed February 14, 2017). However, Employer's reliance on *Szymanski* is wanting.

In *Szymanksi*, this Court held that the discovery rule does not extend the time limitations of the Act and provided that the claimant in the case was not entitled to the presumption that his workplace exposure to Group 1 carcinogens caused his cancer, since he filed his claim more than 300 weeks after his last exposure. In addition, the WCJ in *Szymanski* found the employer's expert on causation to be more credible than that of the claimant's, such that the claimant did not meet his burden on the claim petition. This is not the situation before us here. Further, Section 301(c)(2) of the Act applies only when the occupational disease manifests itself *before* the effective date of Act 46 in July 2011. *See Caffey; Haines*. In the present matter, Claimant filed his Petition in January 2016 for an occupational disease that occurred in 2015.

In sum, Claimant here did not need to bring his claim within the 300-week period of Section 301(c)(2), where he filed within 600 weeks of his last date of exposure to the hazard alleged to have caused his kidney cancer. There is no dispute that by filing within 600 weeks, rather than within 300 weeks, Claimant was not entitled to the statutory presumption referenced in Section 301(f) and Section 301(e) of the Act. Notwithstanding that he did not qualify for the presumption,

Claimant's Petition was still timely and was substantiated sufficiently by his and Dr. Guidotti's credited testimony, testimony which met the standard addressed in *Sladek*. Thus, the Board did not err in affirming the WCJ's decision that Claimant met his burden of proof on the claim.

## 2. AWW

Employer also asserts that the WCJ failed to properly identify the date of injury for calculating Claimant's AWW. Employer contends that the correct AWW used to calculate Claimant's disability benefits rate (if any) should be determined based on Claimant's earnings when he was employed part-time, in 2015, at Thomas Honda. Employer asserts that the Act is not intended to make claimants financially more well off than they were prior to the onset of the occupational disease and that the AWW should be calculated as of the date of disability. Citing *Triangle Building Center v. Workers' Compensation Appeal Board (Linch)*, 746 A.2d 1108 (Pa. 2000), Employer argues that the calculation of the AWW under Section 309 of the Act[9] is to ensure that wages accurately reflect what the injured worker would have earned if not for the injury.

Here, Claimant's diagnosis and loss of earnings occurred almost nine years after his retirement from Employer. When Claimant lost earnings for the eight weeks following his cancer surgery, he was employed by Thomas Honda. Thus, Employer contends the AWW that would most accurately reflect Claimant's

[9] Section 309 of the Act, 77 P.S. §582, addresses the various methods for calculating a claimant's AWW. 34 Pa. Code §121.14 states that, in occupational disease cases, the weekly wage will be determined in accordance with Section 309 of the Act, and "a claimant's compensation rate shall be subject to the maximum compensation payable rate in effect at the date of last exposure."

16

disability (*i.e.,* wage loss) would be based on his earnings at Thomas Honda. Employer criticizes Claimant's reliance on *Fisk*, noting that the Court and the Board in that case relied upon Section 309 of the Act and Board regulations at 34 Pa. Code §121.14 to determine that the <u>rate of compensation</u> in an occupational disease case is fixed by the date of last occupational exposure to the hazard. Employer agrees the rate of compensation is fixed in the year during which a claimant is last exposed. However, Employer asserts that *Fisk* does not provide precedential authority regarding the calculation of AWW in an occupational disease case, despite setting the rules regarding the rate of compensation.

Employer acknowledges that an occupational disease does not become compensable until and unless it manifests itself into a loss of earning power and that occupational disease can be the basis for an "injury" pursuant to the Act. Employer posits that to calculate the AWW here "the wages used are those occurring in the 52-week period prior to the disease becoming compensable as an injury" (Petitioner's Brief at 24), and the date of injury is the date of loss of earning power from the occupational disease <u>for calculating AWW only</u>. Employer suggests that calculation of the AWW is based on the date of disability (in 2015) but that the limitation on Claimant's maximum compensation rate is the date of last exposure (in 2006).[10] We disagree.

---

[10] Employer argues that the W-2 records show Claimant earned $3,816.22 in 2015, down from $4,353.66 in 2014, and that Claimant's AWW, based on the higher earnings in 2014, would be approximately $83.00 per week, resulting in a compensation rate of $75.00 per week for disability benefits. However, the WCJ awarded disability benefits based on Claimant's AWW beginning on September 10, 2006, looking back 52 weeks. The resulting AWW was $821.85 with a compensation rate of $547.90. Thus, Employer maintains that Claimant was awarded $4,383.20 for the eight-week disability period, when his *actual* wage loss was only approximately $650.00.

17

Employer's argument strains credulity, as it disregards *Fisk* and attempts to create a distinction in the current context where none exists. In this regard, we reiterate our pronouncement in *Fisk* that:

> [t]he weekly wage [in occupational disease cases] will be determined in accordance with section 309 of the act (77 P.S. §582), and will be subject to the maximum rate in effect at the date of last exposure.
>
> We note that if we were to accept…that benefits are to be awarded based on the rate of compensation in effect on the date that employee's disability manifests itself into a loss of earning power, an illogical and unjust result would occur for those employees who are unemployed or retired as of the manifestation date and thus have no earnings upon which to base an award. We therefore, conclude that for the purpose of calculating benefits in occupational disease cases under the Act, the date of injury must be the date of last exposure.

*Id*. at 1307 (emphasis added).

Employer further asserts that the intent of the General Assembly was to ensure that claimants are compensated for otherwise lost wages and that, accordingly, Claimant should have been compensated based on his actual wage loss in 2015. Employer contends that the General Assembly intended that "the baseline figure from which benefits are calculated should reasonably reflect the economic reality of a claimant's recent pre-injury earning experience, with some benefit of the doubt to be afforded to the claimant in the assessment." *Linch*, 746 A.2d at 1112.

Although *Linch* may reflect the General Assembly's intent to account for a claimant's "economic reality," *Fisk* governs here. *Fisk* leaves no uncertainty that the rate of compensation in an occupational disease case is fixed in the year

during which the claimant is last exposed and that the AWW is subject to the maximum rate in effect at the date of the claimant's last exposure. In the present matter, that was 2006. Thus, the WCJ committed no error when he calculated Claimant's AWW based on his wages as a firefighter for Employer in 2006, and the Board did not err when it affirmed the same.

### III. Conclusion

Claimant timely filed his Petition, and it was supported by the substantial, competent evidence of record. The WCJ and the Board correctly applied the standards set out in the Act and in the pertinent case law. Discerning no error below, we affirm the Board's order.

_____
J. ANDREW CROMPTON, Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

City of Johnstown,                          :
                 Petitioner           :
                                :
             v.                    :         No. 1156 C.D. 2019
                                :
Workers' Compensation Appeal    :
Board (Sevanick),                   :
             Respondent      :

## **O R D E R**

**AND NOW**, this 6th day of May 2020, the order of the Workers' Compensation Appeal Board is **AFFIRMED**.

 

_____
J. ANDREW CROMPTON, Judge